UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHUOC TRAN,<br><br>                       Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary,<br>California Department of<br>Corrections and Rehabilitation,<br><br>                    Respondent. | Case No.: 17cv2132-L-MDD<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS** |

# I. <u>INTRODUCTION</u>

This Report and Recommendation is submitted to United States District Judge M. James Lorenz pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Phuoc Tran ("Petitioner"), a state prisoner, seeks federal habeas relief from a felony conviction for 12 counts of committing a lewd act on a child under the age of fourteen (Cal. Penal Code § 288(a)) (victims M, D, C, and Peter), substantial sexual conduct with the victims (Cal. Penal Code § 1203.66(a)(8), and committing an offense described in Cal. Penal Code § 667.61(c) against more than one victim (Cal. Penal Code § 667.61(b)(c)(e);

Cal. Penal Code § 1203.066(a)(7)).  (ECF No. 7-21 at 109-125).[1]  After reviewing the Petition (ECF No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF No. 6), Petitioner's Traverse (ECF No. 8), and pertinent state court lodgments, the Court **RECOMMENDS** Petitioner's federal Petition for Writ of Habeas be **DENIED**.

## II. <u>PROCEDURAL HISTORY</u>

### A. State Proceedings

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")).  Accordingly, the following facts are taken from the California Court of Appeal's August 30, 2016, opinion in *People v. Tran*, Appeal No. D067919.  (*See* ECF No. 7-25 at 2-10).

> In 2013, defendant was married and lived with his elderly parents (Grandparents).  Defendant had six adult siblings, all of whom had children.  At the time, the extended family was close and celebrated birthdays and other milestone events together.  The children of the siblings (the cousins) often played together.  The family had immigrated [sic] from Vietnam, and many of the adults spoke only Vietnamese.
>
> One of defendant's brothers has three sons (Michael, age 22; Peter, age 17; David, age 16), and one daughter (M, age 11) (ages at

---

[1] All pincite page references refer to the automatically generated ECF page number, not the page number in the original document.

the time of trial). Another one of defendant's siblings has one child, a daughter (C), who was 18 at the time of trial. Another one of defendant's siblings (Tracy) has two children. Tracy's husband's niece is D, who was 17 at the time of trial.

The jury found defendant committed lewd acts against four of these younger relatives: siblings Peter and M, their cousin C, and D. The abuse occurred at various times and over many years. None of these children immediately reported the misconduct. When they later reported, some of the reporting was gradual.

## A. *Chronology of Disclosures*

The disclosures were triggered by a family event that took place at the Grandparents' home during the weekend of May 17 through May 19, 2013 (the Family Party). The extended family was celebrating a birthday and anniversary, and many family members stayed overnight at the Grandparents' house (where defendant lived; and Peter and C also lived while going to school).

During the Family Party, Peter saw defendant take Peter's nine-year-old sister M into defendant's bedroom. When Peter attempted to open the door, it was locked. Peter went into an adjacent room and listened through a closet, and thought he heard moans. Peter was concerned because he and C had recently told each other about incidents of sexual abuse by their uncle (defendant) when they were much younger.

M later testified that she had been playing with her younger cousin, when defendant asked her to go into his room. When she did so, he locked the door and told her to take off her clothes. M pulled her pants and underwear down to her knees and laid on defendant's bed. At first, she was on her back and defendant touched his penis to her vagina. M saw defendant's penis through "a hole on [his] underwear." After telling M to turn over, defendant put his penis into her "butt." Someone knocked on the door and defendant said "wait." Defendant and M then put their clothes back on and M left the bedroom. M was not crying and "acted normally" when she left the room. As detailed below, this form of abuse had occurred many times since M was five years old.

After this event occurred, Peter and several of the cousins met in a room, and told M to come in the room. Peter then asked if defendant had touched her inappropriately. M repeatedly denied it, but Peter kept pushing her to tell the truth. After about 20 minutes, M admitted that defendant had done so. She said defendant told her not to tell anyone. The older cousins then had lengthy discussions about what to do with the information. Some wanted to confront defendant; others wanted to tell the adults; and others (Peter) wanted to call the police.

On Monday evening following the Family Party, Peter called the police and told them that defendant had been molesting younger relatives, including Peter's younger sister (M) and 16-year-old cousin (C), and that defendant had molested him when he was about eight years old. Peter's father and the Grandparents were extremely angry at Peter's report and instructed him to tell the police that he had lied about the abuse. Peter called 911 and told the officers he was afraid for his safety, and he spent the night in protective custody.

Shortly after Peter's report, on May 21, C was interviewed by a social worker, who came to her high school unannounced. After initially denying the abuse, C began crying and told the social worked that defendant had touched her "'down there.'" When asked what she meant, she said her "vagina." She said defendant "tried to have sex" with her and tried to "penetrate" her. She said this conduct occurred at nighttime on multiple occasions. She said it began when she was nine years old and that it stopped when she was 12 or 13 years old when she began locking her bedroom door. Later that day, when her cousin Michael (Peter's older brother) picked her up from school, C told him that defendant had repeatedly touched her "down there" when she was in her bedroom. C said she did not tell an adult about the abuse because she feared it would ruin the family.

On that same day, Peter and M's mother heard about Peter's accusations and picked up M from school early. When M's mother asked M whether she had gone into a bedroom alone with defendant, M responded that she could not say. After M's mother told her she loved her and repeatedly said that M needed to tell the

truth, M disclosed some of the conduct to her mother. M's mother testified that M said that defendant "Asked her to come in the room. Asked her to lay down on the bed and pull her pants down to her knees . . . . [M] [s]aid that uncle [defendant] took his [penis] and touch her butterfly [vagina]." When M's mother asked her if she was hurt, M responded that "it was not inserted inside," but "her uncle pull it out" after M said "Ouch. Ouch." M said that defendant told her not to "say this to anybody including the parents." M denied she was in pain or had bled. M's mother examined M's vaginal area and did not see any visible injury.

Later that day (May 21), a social worker told M's mother to bring M to Children's Hospital to be interviewed. During the car ride, M was told by her father and/or mother not to tell the truth and to lie and say that nothing happened. They were worried about the health of defendant's mother if defendant was arrested. When M was interviewed by social worker Laurie Fortin later that day, M denied that anything had occurred. She said that she had made up the story to her brothers and cousins because they were "asking so [many] times."

Two weeks later, on June 4, M's mother admitted to police officers that M had disclosed the abuse and that she had instructed M to lie to social workers. The next day, on June 5, M's mother brought her back to Children's Hospital to be reinterviewed by the same social worker. During the second interview, M disclosed that defendant began abusing her when she was about five years old. M described how defendant would rub his penis on her vaginal area, but she denied any penetration. M did not have a medical examination on that date, and there was no evidence that police officers or the social workers recommended or asked M's parents to permit a doctor to conduct an examination.

Two months later, at the preliminary hearing on August 29, M elaborated on her disclosures. At the hearing, M disclosed for the first time that defendant also touched his penis to her "butt," and that the touchings had occurred outside and inside her vaginal and anal areas.

About 10 days after M first disclosed the abuse to the social

worker, in mid-June 2013, D's family received a phone call from relatives in Vietnam about the accusations against defendant. The relative said D had been identified as a possible victim and told D not to disclose any abuse. After receiving the phone call, D began crying and told her parents she had been sexually abused by defendant when she was about eight years old. D had not been at the Family Party, and was not in contact with Peter. Several days later, D's parents called police officers, who interviewed D.

Several months later, in about February or March 2014, Children's Hospital (through an investigator) called M's parents requesting that M be brought in for a medical examination. M's parents ignored the phone calls, and declined to bring her in for the examination.

During the first trial that took place in April and May 2014, the jury was unable to reach a unanimous verdict on any of the charges concerning Peter, C, M, or D. After the trial, the prosecutor learned that Peter and M's brother David was also alleging that he was abused by defendant when he was younger.

### B. *The Second Trial*

The second trial took place in February and March 2015. At the trial, C retracted her allegations against defendant and testified she made up the accusations to get defendant in trouble. There was evidence that C was under substantial pressure from her parents and other relatives not to testify against her uncle. However, the three other alleged victims (M, Peter, and D) testified in detail about the sexual abuse committed by defendant.

Eleven-year-old M testified to the incident in the bedroom during the Family Party (as summarized above), and also provided more detail about the past abuse. In summary, she said that defendant touched his penis to her vagina "[a] bunch of times" ("more than 10 times") beginning when she was in kindergarten. She said that defendant "push[ed] his penis inside her "middle" (vaginal area) and "pushed" his penis inside the "hole" in her butt on numerous occasions (more than 10 times). She said these acts made her feel uncomfortable, and that she would feel pain "[w]hen he did it too hard." She said that defendant also used his hands to

touch her chest. M said she did not tell her parents or her brothers because defendant told her not to tell anyone. She described various additional details, including the places where the abuse occurred (mainly bedrooms and bathrooms in various family homes).

Seventeen-year-old Peter testified that when he was eight years old defendant came into his bedroom and rubbed Peter's testicles and penis for a lengthy period, telling Peter that it was a medical examination. He also described a similar touching in a room in a hair salon owned by a family member. Peter also described conversations with C in which she disclosed that defendant had sexually abused her on multiple occasions when she was younger.

Seventeen-year-old D testified that when she was eight or nine years old, she had a sleepover with her cousin C. As D was falling asleep, defendant came into the bedroom and began touching her legs. Defendant then pulled D's pajama pants down and began touching her "private spot" (vagina). Defendant put his mouth on her vagina until D stopped it by getting up. Defendant then told her to go back to sleep and left the room. D woke up C to tell her what happened. D did not tell an adult what had happened because she was scared. When D was in eighth or ninth grade, she told her best friend (Y) about the molestation. In her testimony, Y confirmed this information. D also testified that, during another sleepover, C and D stayed up late at night and had a discussion about defendant. D and C each told the other about defendant molesting them.

The prosecution additionally presented the testimony of 15-year-old David, the brother of Peter and M. As described in more detail below, David testified that defendant repeatedly touched his penis and testicles from the time David was about six or eight until he was about 13.

The evidence also showed some of the adults in the extended family (defendant's siblings and parents) were pressuring these witnesses to recant their accusations.

(ECF No. 7-25 at 2-9).

On March 17, 2015, a jury convicted Petitioner of 12 separate counts of a lewd act upon a child, against victims M, D, C, and Peter. (Pen. Code, § 288(a)). As to M, the jury found defendant guilty of four lewd act offenses: two counts of "Penis to Vagina" and two counts of "Penis to Butt." As to D, the jury found defendant guilty of two lewd act offenses: one count of "Mouth to Vagina" and one count of "Hand to Vagina." As to C, the jury found defendant guilty of two counts of "Touching Private Parts" and two counts of "Touching Breasts." As to Peter, the jury found defendant guilty of two lewd act counts: one count of "Hand to Penis" and one count of "Hand to Testicles." The jury was unable to reach a verdict on count 13 pertaining to Peter (the alleged abuse at the nail salon), and that count was dismissed. (*See* ECF No. 7-21 at 109-125). The trial court sentenced Petitioner to a total prison term of 180 years to life. (ECF No. 7-17 at 16-17).

On November 10, 2015, Petitioner filed a Notice of Appeal. (ECF No. 7-22). Petitioner argued: (1) the prosecution team committed outrageous government conduct; (2) the sexual assault response team ("SART") violated Petitioner's due process rights by failing to perform a medical examination on the complaining witness who claimed to have repeatedly been raped and sodomized by Petitioner; (3) the trial court should have instructed the jurors to draw an adverse inference from the state's failure to order medical tests that, Petitioner argues, would likely have established his guilt or innocence as to the charges involving penetration, and alternatively trial counsel was ineffective by failing to request this instruction; (4) the trial court erred by admitting David's testimony; and (5) cumulative errors deprived Petitioner of his right to a fair trial. (ECF No. 7-22 at 26-71). On August 30, 2016, the state appellate court affirmed the trial court's judgment. (ECF No. 7-25 at

17cv2132-L-MDD

28).

On October 5, 2016, Petitioner filed a petition for review in the California Supreme Court, raising the same five issues raised in the state appellate court. (ECF No. 7-26 at 12-57). On November 22, 2016, the California Supreme Court denied the petition. (ECF No. 7-27).

**B. Federal Proceedings**

On October 17, 2017, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1). Petitioner challenges his conviction on all five grounds previously raised in the state appellate court and the California Supreme Court.

On December 18, 2017, Respondent answered the Petition. (ECF No. 6). On January 22, 2018, Petitioner filed a Traverse. (ECF No. 8).

## III. <u>STANDARD OF REVIEW</u>

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh*, 521 U.S. 320. Title 28, U.S.C. § 2254(a) provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States.

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early*

*v. Packer*, 537 U.S. 3, 7-8 (2002).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 405-06. A state court decision does not have to demonstrate an awareness of clearly established Supreme Court precedent, provided neither the reasoning nor the result of the state court decision contradict such precedent. *Early*, 537 U.S. at 8.

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86). An unreasonable

17cv2132-L-MDD

application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Instead, the state court's application must be "objectively unreasonable." *Id.* at 76; *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Even if a petitioner can satisfy § 2254(d), the petitioner must still demonstrate a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007).

Federal courts review the last reasoned decision from the state courts. *See Ylst. v. Nunnemaker*, 501 U.S. 797, 805-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). The petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement . . . ." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (citation omitted). It is not within a federal habeas court's province "to reexamine state court determinations on state-law questions . . . ." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

## IV. **DISCUSSION**

### A. Claim 1: Outrageous Government Conduct

#### 1. State Court Opinion

Petitioner presented this claim to the state appellate and California Supreme Court on direct review. (ECF Nos. 7-22; 7-26). The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority. (ECF Nos. 7-25

17cv2132-L-MDD

at 2; 7-27). Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

### A. *Lack of Medical Examination*

Defendant raises several appellate contentions arising from the fact that no medical examination was conducted on M after she initially disclosed the sexual abuse to authorities. We first summarize the evidence relevant to the medical examination issue, and then address each of the contentions. We find no error.

### *Relevant Facts*

M first disclosed the abuse to authorities on June 5 about 17 days after the last abuse incident. She disclosed during a forensic interview with a social worker at the Chadwick Center at Rady's Children's Hospital (Chadwick Center). At the time, M reported penis to vagina contact, but indicated the touching was on the outside of her vaginal area. There was no evidence showing that the social workers or law enforcement requested or recommended that M undergo a physical examination at that time.

At trial, the prosecution and defense each presented a medical expert who testified on the issue of whether a medical examination should have been performed and what findings might have been expected if an examination had been performed. The prosecution's expert was Dr. Jennifer Davis, the medical director of the Chadwick Center. The defense expert was Dr. Lynne Ticson, a pediatrician specializing in child sexual abuse who is the chief physician at Los Angeles County juvenile hall facilities.

Dr. Davis testified that the Chadwick Center does not generally perform a medical examination if a child is denying any contact. Dr. Davis said she was not consulted when M first disclosed the abuse about three weeks later, and she did not know why M was not initially offered a medical examination. Dr. Davis testified that generally if a child reports sexual abuse or sexual assault within 72 hours of the incident (characterized as the "acute" period), an examination should be conducted for forensic purposes, but after that time, the purpose of an examination is primarily for

healthcare reasons.  She explained that well-established scientific studies show after the 72-hour period (or at the very most one week), physical injuries will be present in less than 5 percent of cases, and anal injuries are "extremely rare" and will be present in only 1 to 3 percent of cases.  She also said that even with sexual intercourse on young girls, the vaginal "area heals rapidly and heals completely most of the time."  She stated that for a 10-year-old girl, a swab for DNA or sperm cells is generally conducted only within 72 hours of the alleged abuse because beyond that time period it is unlikely that any such evidence would remain.  She also said that girls will often have a normal intact hymen even after sexual intercourse.  She additionally stated that young girls often misidentify touching as penetration, explaining that touching to the outer vaginal area can feel to a young girl that the finger or penis has gone "inside" the vagina.

Dr. Ticson's opinions were essentially consistent with Dr. Davis's testimony on these issues.  Dr. Ticson acknowledged that most sexual abuse injuries "heal rapidly" and most sexual abuse examinations of children do not result in physical findings, particularly after the 72-hour period.  She agreed that studies have found that " 'Even with a history of severe abuse, such as vaginal or anal penetration, the rate of abnormal medical findings is only 5.5 percent.' "  Dr. Ticson discussed a possible exception to this rule if there is blunt force trauma and "full penetration" into a five-or six-year-old girl's vaginal area.  She said with such force, there could be substantial injury, including disruption of the hymen, vaginal tearing, bleeding, and internal damage.  Dr. Ticson said that absent this form of trauma (which she said frequently does not occur with family member sexual abuse), most sexual abuse examinations of children do not result in physical findings.  She also acknowledged that sometimes children do not have bleeding even if "sex is forced upon them."  She said that although a forensic medical examination of the vaginal area is "gentle," if the child denies any abuse occurred, an examination is not "automatically done" and she would not force a child to have an examination.  Dr. Ticson agreed that the history from the child is the most important diagnostic feature in determining whether abuse occurred.

Defendant contends the court had a duty to dismiss all

17cv2132-L-MDD

criminal charges because the undisputed evidence shows the state acted in an "outrageous" manner by failing to require M to undergo a medical examination. Defendant argues that the examination "would almost certainly have shown whether [M] had been regularly raped and sodomized for four years as she said."

Defendant forfeited this argument by failing to raise it below. The proffered defense requires an analysis of facts, and is not purely a legal issue. (See *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445-446 (*Velasco-Palacios*).)

Even if we were to reach the issue, the contention has no merit. M first reported penis-vaginal contact about 17 days after the last incident. Both the prosecution expert and the defense expert testified that it is unlikely that a medical examination would disclose injuries after the 72-hour period. This defeats defendant's contention that the examination "would almost certainly" have shown whether he committed the crime. Moreover, on the date of the first disclosure, there was no indication that M had been "regularly raped and sodomized." M denied there was any penetration, and there was no indication she was in any kind of pain or distress. On this record, there is no basis for finding the social workers and/or law enforcement officials acted in an "outrageous" manner by failing to offer a forensic medical examination. Although both experts testified they would have preferred to have a medical examination at this first disclosure, both indicated this was primarily for healthcare reasons, and not to obtain evidence of the abuse.

Moreover, it is unclear whether and under what circumstances a wrongful governmental action can serve as valid grounds for dismissing criminal charges. But assuming the validity of this defense, it precludes a prosecution only "'in the rarest and most outrageous of circumstances'" (Miller, *The Case for Preserving the Outrageous Government Conduct Defense* (1996) 91 Nw.U L.Rev. 305, 321), where a prosecution would violate "'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process clause of the Fifth Amendment." (*United States v. Russell* (1973) 411 U.S. 423, 432.)

17cv2132-L-MDD

For example, in *Velasco-Palacios*, the reviewing court upheld the dismissal of criminal charges based on the trial court's finding that the prosecutor had *deliberately* altered an interrogation transcript to *add a false confession* and had provided the transcript to defense counsel when the prosecutor knew the counsel was attempting to convince the defendant to settle the case. (*Velasco-Palacios*, *supra*, 235 Cal.App.4th at pp. 446-452.) Focusing on the prosecutor's "conscience shocking" conduct of adding false information to a transcript and finding that this conduct materially interfered with the defendant's right to counsel, the court determined the dismissal of the criminal charges was the appropriate sanction. (*Ibid.*)

There is no similar basis to dismiss the criminal charges in this case. Unlike a deliberate falsification of a defendant's pretrial interrogation, there was no evidence showing the absence of a forensic medical examination on M reflected bad faith or any form of fundamental unfairness.

(ECF No. 7-25 at 10-15) (footnotes omitted).

## B. *Police Interviews Did Not Preclude a Fair Trial*

Defendant contends the trial was unfair because the investigating officers acted wrongfully by asking "leading and improper questions" to minors. Defendant forfeited this argument because it was not asserted in the court below. Additionally, the argument fails on its merits.

Defendant primarily focuses on an interview of a witness (E) who never testified at trial. The trial court excluded E's testimony because it found the questioning was "highly suggestive" and "unprofessional." Because the jury was unaware of this interview and there is no indication the verdicts were based on statements made by E, there are no grounds for reversing the judgment based on the interview.

With respect to the two other claimed suggestive interviews, we have examined the relevant testimony and find there was nothing fundamentally unfair about the interviews. First, with respect to C, defendant complains that the police officers asked her

leading and suggestive questions. However, despite these questions, the record reflects that C (who was 16 years old at the time) had previously volunteered specific information about the abuse to social workers. In recanting her accusations, C did not suggest her earlier statements were the result of an unfair police interview; instead she said she intentionally made up the false accusations to help Peter get her uncle into trouble. C's statements to the police officers were also corroborated by Michael, C's cousin, who had previously been in a close and friendly relationship with defendant. Shortly after C first disclosed, Michael picked up C from school, and on the way home, C repeated the same accusations against defendant. Finally, defense counsel conducted a strong cross-examination of the police officers involved in the interview, and the jury had full information to decide whether C's responses were the result of an unfair interview or were made independently.

Second, with respect to Y's interview, defendant complains that the prosecutor made improper efforts before trial to "get [Y] to say that [D] told her she had been 'molested' by appellant." The record does not support this assertion. Defendant cites only to defense counsel's argument to the court, and not to any alleged unfair questions. Further, after reviewing Y's testimony, we are satisfied that Y testified from her own recollection and that any statements made to her during the pretrial interview did not improperly influence her testimony. Y was careful to explain that she remembered only generalities about the conversations with D. Defense counsel was given substantial latitude to vigorously cross-examine Y regarding her memory of the conversations, and the jury, as the trier of fact, had full information to decide whether Y was credible.

(ECF No. 7-25 at 18-20) (footnotes omitted).

## 2. Summary of Arguments

### a. Lack of Medical Examination

Petitioner argues the government committed outrageous government conduct by failing to medically examine the victim. (ECF No. 1-2 at 14). Petitioner further argues the state had a duty "to collect physical evidence

17cv2132-L-MDD

from a medical exam that would almost certainly have shown whether M[ ] had been regularly raped and sodomized for four years . . . ." (*Id*. at 15). Petitioner argues that the appellate court misapplied Supreme Court precedent in rejecting this claim. (*Id*. at 17). Petitioner argues that the appellate court should have found the state's actions were outrageous for due process purposes and dismissed the charges. (*Id*.).

Respondent first contends that this claim was forfeited by the failure to raise it at trial. (ECF No. 6-1 at 22). Respondent argues that "[t]he State simply has no duty to gather evidence." (*Id*. at 23). Respondent argues that Petitioner's argument is meritless and the appellate court's decision should be upheld because it was reasonable. (*Id*. at 22, 24).

### b. Police Interviews

Petitioner argues that the government committed outrageous government conduct by allowing police officers to question several of the alleged victims with leading and inappropriate questions. (ECF No. 1 at 11). Petitioner contends only highly trained social workers should be allowed to interview child victims of sexual abuse. (*Id*. at 16). Petitioner further argues that the type of questioning used by the officers resulted in "improper coaching or even witness tampering" and maintains that the investigation techniques employed by the officers "is shocking to the conscience." (*Id*. at 17).

Respondent argues this claim is also forfeited and defaulted by failure to make any objection in the trial court. (ECF No. 6-1 at 25). Respondent argues there is no Supreme Court precedent for this claim and who conducts victim interviews is not a basis for a constitutional violation. (*Id*. at 25). Respondent further argues that the jury had the ability to decide whether C's responses were the result of an unfair interview and to determine Y's

credibility.  (*Id.*).

### 3. Legal Standard

The Supreme Court has suggested in dicta that outrageous government conduct may give rise to a due process defense.  *United States v. Russell*, 411 U.S. 423, 431-32 (1973).  However, as noted previously, "clearly established federal law . . . refers to the holdings, as opposed to the dicta . . ." of the Supreme Court's decisions at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412.  Thus, there is no clearly established Supreme Court law on an outrageous government conduct claim.

### 4. Analysis

The Supreme Court has not directly addressed whether a state's actions reflected a form of fundamental unfairness which would constitute a claim of outrageous government conduct.  Therefore, there is no clearly established federal law on the issue of outrageous government conduct for the appellate court's decision to conflict with or be unreasonably applied.

Furthermore, the appellate court's decision that M was not required to undergo a medical examination was not based on an unreasonable determination of the facts.  M first reported the conduct seventeen days after the last alleged incident with Petitioner.  Medical experts for the prosecution and defense indicated it was highly unlikely there would be any physical findings of sexual abuse beyond 72 hours after the last incident. Additionally, the primary purpose for conducting such an examination is to determine the health and well-being of the victim, not to obtain evidence.

Moreover, Petitioner's claim that the police interviewing the witnesses led to "improper coaching" also fails.  Petitioner primarily focuses on the testimony of a witness, E, whose testimony was never used at trial.  As to the other two witnesses Petitioner contends were improperly coached, C and Y,

the defense had ample opportunity to cross-examine them and the jury was left to determine the credibility of the two witnesses from the evidence presented. Additionally, there is no clearly established Supreme Court precedent which requires only trained social workers, rather than police officers, to conduct interviews of sexual abuse victims. Thus, the appellate court's decision was not an unreasonable application of federal law.

Petitioner has done nothing to show that government's conduct was grossly shocking here and nothing in his claim establishes that the government's actions violated the universal sense of justice. The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 1.

## B. Claim 2: SART's Failure to Perform a Medical Examination and Preserve Potential Evidence

### 1. State Court Opinion

Petitioner presented this claim to the state appellate and the California Supreme Court on direct review. (ECF Nos. 7-22; 7-26). The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority. (ECF Nos. 7-25 at 2; 7-27). Accordingly, this Court must again "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

> In a related argument, defendant contends his due process rights were violated because the state did not preserve potentially exculpatory evidence by conducting a forensic medical examination on M. He argues the failure to conduct the examination violated his due process rights because it was "likely" to show his "guilt or innocence."

> Defendant forfeited this argument by not raising it below. He asks this court to nonetheless reach his contention because it is "an important constitutional issue" and "the facts here are undisputed."

However, the forfeiture doctrine applies to constitutional issues. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn.17; *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.)

Moreover, the relevant undisputed facts do not support defendant's contention. Under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), the state has a duty "to *preserve* 'evidence that might be expected to play a significant role in the suspect's defense.' " (*People v. Montes* (2014) 58 Cal.4th 809, 837, italics added.) Defendant is asking this court to extend that principle to impose a duty on the state to *collect* potentially exculpatory evidence. Even assuming there is support for such an extension (see *Montes*, at p. 838; *Miller v. Vasquez* (9th Cir. 1989) 868 F.2d 1116, 1120), a *Trombetta* duty arises only where the exculpatory value of the evidence is "apparent" (*Montes*, at p. 837). As discussed above, it would not have been apparent to law enforcement officials that a medical examination would benefit defendant's case. The testimony from both experts supported that when M first disclosed the abuse, it was unlikely there would be any physical findings to support a true claim of abuse. Thus, a physical examination would have little or no probative value to support a defense to the sexual abuse charges.

Further, there is no due process violation on a failure-to-preserve claim unless the defendant shows law enforcement acted in bad faith with an "animus towards [the defendant] or [a] conscious effort to suppress exculpatory evidence." (*Trombetta, supra*, 467 U.S. at p. 488.) There was no evidence of a conscious effort to suppress evidence in this case.

Defendant contends an "important constitutional issue" is "whether there is a due process obligation for the police to gather potentially exculpatory evidence . . . through a routine medical exam that would *likely* show the defendant's guilt or innocence as to one of the victims . . . ." (Italics added.) However, this issue is not presented here because the factual predicate is missing. There is no evidence in the record showing the medical examination would "likely show . . . defendant's guilt or innocence . . . ."

(ECF No. 7-25 at 15-17).

17cv2132-L-MDD

## 2. Summary of Arguments

Petitioner argues the state's failure to order a medical examination and gather potential evidence violated due process. (ECF No. 1 at 20). Petitioner claims the state acted in bad faith by refusing to test the evidence that may have proved his innocence. (*Id.*). Petitioner further argues that the examination was not ordered because either the officer lacked the medical knowledge that evidence of penetration will exist after 72 hours, or feared that the evidence might not yield the desired results. (*Id.*). Petitioner maintains that the error was "fundamental and compels federal habeas corpus relief." (*Id.* at 22).

Respondent argues there is no clearly established Supreme Court precedent requiring a child victim of sexual abuse to undergo an examination and therefore this Court should defer to the state court's decision. (ECF No. 6-1 at 22-24). Respondent maintains this is not a case of destruction of evidence because there was no evidence to destroy. (*Id.* at 22-23). Additionally, Respondent argues the government was not acting in bad faith when they chose not to pursue a medical examination and that Petitioner cannot establish the evidence would have been exculpatory. (*Id.*).

## 3. Legal Standard

Generally, law enforcement officials have a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). While the Supreme Court has not directly addressed the duty to collect potentially exculpatory evidence, some courts have held that *Trombetta* imposes a duty to collect such evidence. *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) (finding the failure to collect potentially exculpatory evidence could be a due

process violation). However, this duty applies only to "material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and this is of such nature that the defendant cannot obtain comparable evidence from other sources." *Cooper v. Calderon*, 255 F.3d 1104, 1113 (9th Cir. 2001) (citing *Trombetta*, 467 U.S. at 489). Additionally, failing to preserve potentially exculpatory evidence only amounts to a due process violation when the petitioner "can show bad faith" on the part of the government. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Miller*, 868 F.2d at 1120 ("Since, in the absence of bad faith, the police's failure to *preserve* evidence that is only potentially exculpatory does not violate due process, then a fortiori neither does the good faith failure to *collect* such evidence violate due process."). Bad faith "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Martinez v. Barnes*, No. 2:12-cv-2975 KJM GGH P, 2013 U.S. Dist. LEXIS 153102, 2013 WL 5773108 at *5 (E.D. Cal. Oct. 24, 2013) (citing *Youngblood*, 488 U.S. at 56-57; *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)).

### 4. Analysis

The Supreme Court has not directly addressed whether the government has an affirmative duty to conduct medical examinations on complaining sexual assault victims. However, assuming that such a duty does exist the appellate court's decision was not an unreasonable application of or contrary to federal law.

As established, requiring M to undergo a medical examination, by the time she reported to the authorities, would not have provided any exculpatory or material evidence. M first reported to the authorities seventeen days after the last alleged incident with Petitioner. Testimony from medical experts in the field of child sexual abuse indicated it was highly

unlikely there would be any physical findings of sexual abuse after the 72-hour period had passed from the last alleged incident. Additionally, both experts indicated the primary reason for conducting a medical examination after a child is sexually abused is to determine the health and well-being of the victim, not to collect evidence. Therefore, the results of the medical examination, which Petitioner purports to have shown his guilt or innocence, would have had little or no probative value and the state refraining from conducting such an examination was not a violation of due process.

Moreover, Petitioner's claim the government acted in bad faith is also without merit. Petitioner has done nothing to establish the state had knowledge a medical examination would produce any evidence or intentionally refused to conduct an examination in bad faith. Instead Petitioner has only alleged that the state lacked the knowledge an examination would produce exculpatory evidence or were afraid of an examination's possible results. However, Petitioner's allegations conflict with the testimony of his own expert. Petitioner has no further basis for his claims other than mere speculation and failed to show that the government made a conscious effort to suppress any potential evidence. An examination was highly unlikely to yield any type of physical findings that would materially prove or disprove the victim was subjected to sexual abuse after 72 hours. Thus, it would not have been apparent to the state that a medical examination was required to produce any material evidence.

Without showing the evidence was apparent or the government acted in bad faith, Petitioner's claim essentially asks this Court to unreasonably extend the government's duty to a new context where it should not apply. The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 2.

## C. Claim 3: Jury Instruction on Adverse Inference From Lack of Medical Examination and Ineffective Assistance of Counsel

### 1. State Court Opinion

Petitioner presented this claim to the state appellate and the California Supreme Court on direct review. (ECF Nos. 7-22; 7-26). The appellate court denied Petitioner's claim on the merits and the denied the petition without comment or citation to authority. (ECF Nos. 7-25 at 2; 7-27). Accordingly, this Court must again "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

> Defendant contends the court erred in failing to sua sponte instruct the jury that "if [M] had been physically examined, there would have been no evidence of an injury, even a healed injury, and that fact alone could be found to establish reasonable doubt." We reject this argument because the proposed instruction is not an accurate statement of the law or facts.

> Defendant relies on *People v. Zamora* (1980) 28 Cal.3d 88 (*Zamora*), in which the California Supreme Court reversed the defendant's convictions for resisting arrest and assaulting police officers because the officers' personnel files were *wrongfully* destroyed by the city before trial. (*Id.* at pp. 93-104.) In remanding the case for retrial, the high court determined that as a sanction for the city's *wrongful destruction of the evidence*, the jury should be instructed the destroyed files contained evidence the officers had used excessive force in the past and that the jury may rely on this information to infer the officers were prone to use excessive or unnecessary force. (*Id.* at pp. 99-103.)

> *Zamora* is inapplicable here. There is no showing a public entity engaged in wrongful conduct in this case. No evidence was destroyed and there was no duty to conduct a medical examination under the circumstances. Moreover, defendant's proposed instruction is incorrect and confusing. Even according to his own expert, the absence of injuries to a child abuse victim does not

constitute reasonable doubt. As stated above, Dr. Ticson testified that "most" examinations of children do not result in physical findings.

Because the instruction is not legally correct, there was no sua sponte duty for the court to give the instruction. (*People v. Kelly* (1992) 1 Cal.4th 495, 532.) We likewise reject defendant's contention that his counsel was ineffective for failing to request the instruction.

(ECF No. 7-25 at 17-18) (footnotes omitted).

## 2. Summary of Arguments

Petitioner argues the trial court, *sua sponte*, should have instructed the jurors to draw an adverse inference from the state's failure to order the medical test. (ECF No. 1-2 at 23). Petitioner contends that in "cases where the police have failed to preserve exculpatory evidence, the courts have emphasized the remedy of instructing the jurors to draw an adverse inference from the state's failure." (*Id.*). Petitioner, in the alternative, contends his trial counsel was ineffective because counsel "failed to request an instruction informing the jurors the failure to conduct the exam could, by itself, exonerate petitioner." (*Id.*). Petitioner further argues it was "more than reasonably probable to assume [he] would have received a better result" if the jury did receive such an instruction. (*Id.* at 25-26). Petitioner argues "[t]he failure to properly charge the jury with a curative instruction rendered the trial fundamentally unfair." (*Id.* at 26).

Respondent argues this claim should be rejected because a challenge to jury instructions does not generally state a federal constitutional claim. (ECF No. 6-1 at 26). Respondent contends that Petitioner's instruction is "misleading, confusing, and incorrectly state[s] the law." (*Id.* at 28). Respondent further argues Petitioner has failed to show deficient performance and prejudice of trial counsel to warrant a showing of ineffective

assistance of trial counsel. (*Id.*).

### 3. Legal Standard

In the context of federal habeas petitions, a challenge to jury instructions does not generally state a federal constitutional claim. *Estelle v. Mcguire*, 502 U.S. 62, 71-71 (1991) (stating "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 (1983) ("The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."). To establish a federal due process violation for failure to give jury instructions, Petitioner must demonstrate that the omission "so infected the entire trial that the resulting conviction violates due process" and not whether "the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). When a challenge to jury instructions is based on the refusal or failure, *sua sponte,* instruct the jury, the burden on the petitioner is "especially heavy" because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *See id.* at 155.

Even if a petitioner meets the heavy burden of proving a trial court's failure to instruct the jury violated due process, habeas relief is not available unless the petitioner can also prove such an error had a "substantial and injurious effect of influence in determining the jury's verdict," and resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also California v. Roy*, 519 U.S. 2, 5 (1996).

To prevail on a claim of ineffective assistance of counsel, a petitioner must show two things. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

First, he must establish counsel's performance was "deficient" in that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* Second, he must demonstrate "the deficient performance prejudiced the defense." *Id.* at 687-88. To satisfy the first prong, the acts or omissions must fall "outside the wide range of professionally competent assistance." *Id.* at 690. A petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." *Id.* at 687. To satisfy the second prong, a petitioner must show a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Moreover, a habeas court's review of a claim under the *Strickland* standard is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). When AEDPA applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). As long as there is a "reasonable justification for the state court's decision," the state court decision will be upheld. *Id.* at 109.

**4. Analysis**

There is no clearly established Supreme Court precedent requiring trial courts *sua sponte* to instruct the jury. Thus, to the extent Petitioner challenges the trial court's application of California law in declining to instruct the jury, *sua sponte,* he has not stated a claim cognizable on federal habeas review.

Petitioner wanted the jury to be instructed that if a medical

27

examination had been conducted, there would have been no evidence of any injury, even a healed injury, and that fact alone could establish reasonable doubt. Petitioner's argument conflicts with his own expert who stated the absence of injuries on a victim of childhood sexual abuse does not constitute reasonable doubt. Thus, Petitioner's jury instruction was not factually or legally correct, and its omission was not prejudicial to the defense. Additionally, Petitioner's expert also stated the most important diagnostic method to determine if any sexual abuse occurred is the child's testimony of the events and Petitioner's victims provided ample testimonial evidence against him.

Furthermore, Petitioner's claim of ineffective assistance also fails because his claim has not met the requirements set forth in *Strickland*. Petitioner has not established his trial counsel was objectively unreasonable or that the results of the trial would have been different if his trial counsel had requested such an instruction, other than mere speculation. Medical experts for the prosecution and defense testified to the factual opposite of Petitioner's purported jury instruction. Therefore, Petitioner's trial counsel acted reasonably in not requesting an instruction that was incorrect and misleading. Petitioner has also failed to establish that the instruction's omission resulted in "actual prejudice" other than making a conclusory argument that it was "more than reasonably probable to assume [he] would have received a better result" which does not meet the requirements of *Strickland*. Thus, the actions of counsel were reasonable and did not prejudice the defense.

Petitioner has not met the heavy burden of showing that the omission of the instruction so infected the entire trial that the resulting conviction violated due process or that his counsel was ineffective under *Strickland*.

17cv2132-L-MDD

Thus, the appellate court's decision is not contrary to, nor an unreasonable application of, clearly established federal law. The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 3.

### D. Claim 4: Admission of David's Testimony at Trial

#### 1. State Court Opinion

Petitioner presented this claim to the state appellate and the California Supreme Court on direct review. (ECF Nos. 7-22; 7-26). The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority. (ECF Nos. 7-25 at 2; 7-27). Accordingly, this Court must again "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

> A. *Factual Background*
>
> Before trial, the prosecutor moved to admit the testimony of 16-year-old David (the brother of Peter and M) under section 1108, which permits the admission of uncharged sex offenses as propensity evidence. The prosecutor made an offer of proof that David would testify that defendant touched David's penis when he was between the ages of eight and 10 years old. The prosecutor said he had been previously unaware of David's allegations because his parents had refused to permit an interview with him. The prosecutor said that when the parents finally allowed a conversation, David disclosed the abuse.
>
> Defendant opposed the motion on numerous grounds, including that the alleged improper touching was remote; David's statement lacked credibility as there is no corroborating evidence; David likely had been "pressured by his older brother Peter to join him in the allegations"; and the testimony would be confusing as defendant was not being charged with the alleged conduct against David.
>
> The court decided to conduct a section 402 hearing to consider David's credibility and the potential relevance of the evidence. At

the hearing, David testified he "remember[ed] a few occurrences where [defendant] has touched my private place," meaning "my testicles and my . . . balls." He later clarified that he was referring to his penis and his testicles. He said his uncle would "grab" his penis and "move it around" and would "grab [his testicles] and squeeze." He said this occurred on multiple occasions from the time he was six or seven years old until he was 13 years old when he "started becoming a teenager." David said he did not tell anyone because he was afraid.

During cross-examination, David said he was told he had been asked to testify because "Peter . . . said that [defendant] raped him and also me." He testified that during the Family Party, Peter repeatedly attempted to "convince" him that he had been raped by his uncle, but that he (David) had denied it. David also said he had been "[c]onflicted" about what he should do because Peter had told him "what to say," whereas his father had instructed him to "lie" about his uncle (defendant). But David also testified that Peter told him he "should always tell the truth and never make stuff up, even if you can't remember and stuff . . . ." David also made a series of conflicting statements about whether and when he spoke with his mother about defendant's conduct, and the nature of that disclosure.

After considering the testimony and arguments, the court ruled David's testimony was admissible under section 1108. The court reasoned that it found David was believable, despite that there would be substantial room for cross-examination on bias, memory, and credibility issues. The court noted that David appeared to be immature, nervous, and not highly articulate, and it was uncertain whether "this is all a figment of his imagination or if he was really touched." But the court found it was the jury's role to make this credibility determination.

At trial, David testified that defendant touched his penis and testicles many times under and over his clothes. He said defendant "would thrust his hand under pan[t]s," and would squeeze his testicles and would "move[ ]" his penis "around." He said the touchings began when he was six or eight years old, and continued until he was 13 years old. He said he was "[v]ery certain" that these

17cv2132-L-MDD

touchings had occurred. He said that they happened when he was alone in a bedroom with his uncle and identified the houses where the abuse had taken place. David said he never told his parents because he did not know how they would react. He said he did not disclose the touchings to anyone until he spoke with the prosecutors in September 2014.

Regarding the Family Party, David remembered one "cousins" meeting, and said that during the meeting Peter kept telling him that he had been "raped" by his uncle and David had repeatedly denied it. David also said he spoke with Peter about coming to court, and Peter told him to "[a]lways tell the truth." David said his father (defendant's brother) told him to lie and not disclose any abuse and that David would "be dead to him" if David did not "lie." During cross-examination, David agreed he had previously said Peter told him to say that he was molested.

## B. *Legal Principles*

Section 1101 prohibits the admission of evidence to show a defendant's propensity to commit a particular crime. Section 1108, subdivision (a) creates an exception to this rule by permitting the admission of a prior sexual offense for any relevant purpose, including to show the defendant's propensity to commit the current sexual offense. (*People v. Loy* (2011) 52 Cal.4th 46, 60; *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) "With the enactment of section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.'" (*People v. Soto* (1998) 64 Cal.App.4th 966, 983.)

Defendant does not challenge that David's testimony was potentially admissible under section 1108 as propensity evidence, but contends the court erred in denying his motion to exclude the evidence under section 352.

In considering the admission of section 1108 sexual offense evidence, the court should conduct a section 352 balancing analysis and exclude the evidence if "its probative value is substantially outweighed by the probability that its admission will necessitate

undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury." (*People v. Loy*, *supra*, 52 Cal.4th at pp. 61-64; accord, *People v. Falsetta*, *supra*, 21 Cal.4th at p. 917.) This determination "'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.'" (*Falsetta*, *supra*, 21 Cal.4th at pp. 917-918.) We must uphold the trial court's ruling unless it "'falls outside the bounds of reason.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371; see *People v. Avila* (2014) 59 Cal.4th 496, 515; *People v. Loy*, *supra*, 52 Cal.4th at p. 61; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1098.)

The court did not abuse its discretion. David's testimony about the abuse reflected actions similar to the charged conduct– engaging in secretive sexual abuse against his prepubescent nieces and nephews within the family homes. Defendant's actions against David (if believed by the jurors) were thus highly probative to show defendant had the propensity to commit this type of crime and made it more likely he engaged in comparable acts against David's siblings and cousins. Additionally, David's testimony was brief and there was little likelihood the jury would become confused or distracted by the evidence. Further, the abuse against David was not more inflammatory than the charged crimes. If anything, it was relatively less substantial. Unlike the abuse committed against M and C, the offenses involved fondling and not attempted penetration.

In arguing the court abused its discretion, defendant focuses primarily on issues surrounding David's credibility, particularly given David's late reporting and his admissions that his brother Peter had told him what to say. However, as the trial court found, the weaknesses in David's testimony pertained to the weight of the evidence, not its admission. The court had the opportunity to observe and consider David's testimony, and found that he was fundamentally a believable witness on the basic fact that he had been subjected to unwanted sexual touchings by defendant. After hearing the testimony and viewing David's demeanor and body language, the court said that "I do not feel he's lying." The court recognized the weaknesses in David's testimony and that a jury may not agree with its credibility assessment, but found the jury

should have the opportunity to consider the evidence and make its own determination.

The court did not abuse its discretion in reaching these conclusions. The reliability and credibility of a witness are matters for the jury to decide, and therefore inconsistencies in the testimony or biases or memory problems generally are not grounds for precluding the admission of the evidence under section 352. (See *People v. Merriman* (2014) 60 Cal.4th 1, 57; *People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Mullens* (2004) 119 Cal.App.4th 648, 660.) Although David suggested at times that he was told what to say by Peter, he also said Peter told him to tell the truth and that he was conflicted because his father was telling him to lie and say there was no improper conduct. The court did not abuse its discretion in finding the jury should make the credibility determination.

We also reject defendant's contention the evidence should have been excluded because it was remote. According to David's testimony, the sexual touchings continued until he was about 13 years old. Since David was 16 years old when he testified, the abuse evidence was not remote. Further, many of the alleged abusive acts against David occurred during the same period as the charged offenses.

We likewise reject defendant's contention the evidence was unduly cumulative. There was no other evidence showing David had also been a victim of defendant's sexual abuse, and the fact that defendant had also abused Peter's younger male sibling had material probative value. In this regard, it is significant that the trial court refused to permit the prosecutor to present the testimony of two other claimed victims under section 1108. This ruling shows the court carefully weighed the proposed testimony and understood the scope of its discretion to disallow section 1108 evidence. Based on the court's detailed explanation for its ruling, we are satisfied the court carefully balanced the relevant factors, and acted within its discretion in determining the defendant did not meet his burden to show the probative value of David's testimony was substantially outweighed by the prejudicial effect.

Further, even assuming the court abused its discretion in admitting the prior sexual offense evidence, the error is not reversible unless the defendant shows a reasonable probability he would have obtained a more favorable result had the court excluded the prior acts evidence. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 924; *People v. Falsetta*, *supra*, 21 Cal.4th at pp. 924-925; *People v. Walker* (2006) 139 Cal.App.4th 782, 808; *People v. Mullens*, *supra*, 119 Cal.App.4th at pp. 658-659.) Defendant has not made this showing in this case.

Defense counsel effectively cross-examined David regarding his memory, his late disclosure, and the pressure various family members placed on him regarding his testimony. Under the circumstances, it is highly doubtful the jury would have been persuaded that defendant was guilty of the charged offenses based solely on David's testimony. If anything, David's testimony had the potential to help defendant's case. Portions of David's testimony supported the defense theory that Peter had convinced his cousins and siblings to falsely accuse defendant in order to retaliate against defendant. David's statements that during the Family Party, Peter repeatedly told him he had been "raped" by defendant and that David had denied this assertion was consistent with the defense case. On our review of the entire record, we are confident that even if the court had not permitted David to testify, the outcome would have been the same. On this issue, we find unhelpful defendant's focus on the fact that David did not testify in the first trial. Without a full comparison between the trials, it is speculative to conclude that this one witness made the difference in the outcome.

(ECF No. 7-25 at 20-27) (footnotes omitted).

**2. Summary of Arguments**

Petitioner argues the trial court "erred by allowing the testimony of a new alleged victim to get to the jury." (ECF No. 1-2 at 33). Petitioner further contends "[t]his is a terrible misuse of section 1108 and one that served to render the trial unfair." (*Id.*). Petitioner also argues David's testimony was unreliable, which violates the threshold for admission. (*Id.* at 31). Petitioner argues the error was prejudicial because the addition of David's testimony in

17cv2132-L-MDD

the second trial was ultimately the reason for his conviction.  (*Id.* at 35).

Respondent argues that the Supreme Court has not yet issued a ruling on the admissibility of evidence, even allegedly prejudicial evidence, so there can be no relief granted in this case.  (ECF No. 6-1 at 32).  Respondent argues that the question of whether David's testimony lacked credibility was a matter for the jury to decide.  (*Id.* at 32).  Respondent concludes that because the California courts found no error in the admission of the evidence under California law, this Court must accept that decision and cannot grant relief.  (*Id.* at 34).

### 3. Legal Standard

Improper admission of evidence under California state law "is not part of a federal court's habeas review of a state conviction."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Id.*  Typically, "a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process."  *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999).  Although the Supreme Court has been clear that a writ should be issued when constitutional errors have rendered a trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ.  Absent such clearly established federal law, federal courts cannot conclude that a state court's ruling was an unreasonable application.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

In order to establish that admitting certain evidence violated a criminal defendant's due process rights, the Petitioner must demonstrate that the admission of the evidence "offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental." *Patterson v. New York*, 432 U.S. 197, 202 (1977); *see also Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). A federal habeas petitioner must show that the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *see McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993) (stating that even where evidence was erroneously admitted, due process is violated only if "the erroneously admitted evidence was of such quality as necessarily prevents a fair trial" and that the evidence actually prevented a fair trial).

### 4. Analysis

There is no established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process. Therefore, the appellate court's decision was not an unreasonable application of or contrary to clearly established federal law.

Admitting David's testimony about the abuse he suffered was not arbitrary and was relevant because it echoed actions similar to the conduct charged by the victims. Additionally, the appellate court recognized David's testimony had weaknesses which could establish Peter had convinced the other witnesses to falsely accuse Petitioner, which would aid, rather than hinder, Petitioner's argument. Thus, David's testimony was reasonably admitted and was not prejudicial to Petitioner's case. Under the highly deferential standard established by AEDPA, the state court's decision is not contrary to nor an unreasonable application of federal law. The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 4.

## E. Claim 5: Cumulative Errors

### 1. State Court Opinion

Petitioner presented this claim to the state appellate and the California

Supreme Court on direct review. (ECF Nos. 7-22; 7-26). The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority. (ECF Nos. 7-25 at 2; 7-27). Accordingly, this Court must again "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

> Defendant contends we must reverse his conviction because the accumulation of errors deprived him of a fair trial. Because we have rejected his contentions of error, we necessarily reject the cumulative error claim. (*People v. Vieira* (2005) 35 Cal.4th 264, 294; *People v. Bolin* (1998) 18 Cal.4th 297, 335.) The record demonstrates that defendant received a fair trial and the verdicts were supported by substantial evidence.

(ECF No. 7-25 at 27).

### 2. Summary of Arguments

Petitioner argues that the combination of errors raised entitles him to habeas relief. (ECF No. 1-2 at 36). Respondent argues the appellate court's decision that there were no errors was reasonable. (ECF No. 6-1 at 35).

### 3. Legal Standard

"The Supreme Court has clearly established the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Id.* Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the

evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)). Cumulative error warrants habeas relief only when the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Parle*, 505 F.3d at 927 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### 4. Analysis

Although cumulative constitutional errors can make a trial fundamentally unfair, Petitioner has failed to establish such a claim. As set forth above, Petitioner has not established that any constitutional errors occurred at his trial. As such, there can be no cumulative effect to render Petitioner's trial unfair. Therefore, the appellate court's decision was not contrary to nor an unreasonable application of federal law. The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 5.

## V. <u>CONCLUSION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** this Petition.

**IT IS HEREBY ORDERED** that no later than **<u>August 2, 2018</u>**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **<u>August 9, 2018</u>**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.

17cv2132-L-MDD

*See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   July 5, 2018

Hon. Mitchell D. Dembin
United States Magistrate Judge

17cv2132-L-MDD